# UNITED STATES DISTRICT COURT FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

ALLAN B. NEWTON,    :
          :
    Plaintiff   :  No. 3:13-CV-0160
          :
  vs.      :  (Judge Nealon)
          :
CAROLYN W. COLVIN, Acting :
Comissioner of Social Security,[1] :
          :
    Defendant  :

## MEMORANDUM

On January 23, 2013, Plaintiff, Allan B. Newton, filed this instant appeal[2] under 42 U.S.C. § 405(g) for review of the decision of the Commissioner of the Social Security Administration ("SSA") denying his application for disability insurance benefits ("DIB") and supplemental security income ("SSI")[3] under Titles II and XVI of the Social Security Act,42 U.S.C. § 1461, et seq and 42

---

1. Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013, and is substituted for Michael J. Astrue as the Defendant in this case pursuant to Federal Rule of Civil Procedure 25(d).

2. Under the Local Rules of Court "[a] civil action brought to review a decision of the Social Security Administration denying a claim for social security disability benefits" is "adjudicated as an appeal." M.D. Pa. Local Rule 83.40.1.

3. Supplemental security income is a needs-based program, and eligibility is not limited based on an applicant's date last insured.

U.S.C. § 1381 et seq, respectively.  (Doc. 1).  The parties have fully briefed the

appeal.  For the reasons set forth below, the decision of the Commissioner denying

Plaintiff's applications for DIB and SSI will be vacated.

## BACKGROUND

Plaintiff protectively filed[4] his application for DIB on April 8, 2010, and his

application for SSI on April 26, 2010.  (Tr. 31).[5]  The claim was initially denied by

the Bureau of Disability Determination ("BDD")[6] on August 3, 2010.  (Tr. 31).

On September 9, 2010, Plaintiff filed a written request for a hearing before an

administrative law judge.  (Tr. 31).  A hearing was held on August 9, 2011 before

administrative law judge Ronald Sweeda ("ALJ"), at which Plaintiff and an

impartial vocational expert, Fran Terry ("VE"), testified.  (Tr. 31).  On August 23,

2011, the ALJ issued a decision denying Plaintiff's claims because, as will be

explained in more detail infra, Plaintiff could perform a full range of light work

---

4.  Protective filing is a term for the first time an individual contacts the Social
Security Administration to file a claim for benefits.  A protective filing date allows
an individual to have an earlier application date than the date the application is
actually signed.

5.  References to "(Tr. _)" are to pages of the administrative record filed by
Defendant as part of the Answer on April 3, 2013.  (Doc. 10).

6.  The Bureau of Disability Determination is an agency of the state which initially
evaluates applications for disability insurance benefits on behalf of the Social
Security Administration.

with no overhead work, crawling, kneeling, or climbing of ladders or scaffolds, a limitation to low stress work defined as simple, repetitive tasks involving simple judgment, no contact with the public, occasional contact with coworkers and supervisors, occasional changes in work setting, and no exposure to a fast-paced production environment, unprotected heights, or dangerous machinery. (Tr. 36).

On September 6, 2011, Plaintiff filed a request for review with the Appeals Council. (Tr. 25). On November 21, 2012, the Appeals Council concluded that there was no basis upon which to grant Plaintiff's request for review. (Tr. 1-3). Thus, the ALJ's decision stood as the final decision of the Commissioner.

Plaintiff filed the instant complaint on January 23, 2013. (Doc. 1). On April 3, 2013, Defendant filed an answer and transcript from the Social Security Administration ("SSA") proceedings. (Docs. 9 and 10). Plaintiff filed a brief in support of his complaint on September 17, 2013. (Doc. 16). Defendant filed a brief in opposition on October 17, 2013. (Doc. 19). Plaintiff filed a reply brief on November 4, 2013. (Doc. 20). On January 15, 2015, the case was reassigned to the Undersigned via verbal order, and the matter is now ripe for review.

Plaintiff was born in the United States on March 24, 1958, and at all times relevant to this matter was considered a "an individual closely approaching

advanced age."[7]   Plaintiff obtained his high school diploma, and can communicate in English.  (Tr. 186, 188).  His employment records indicate that he previously worked as a maintenance worker, laborer, sales associate, and a short order cook.  (Tr. 211).  The records of the SSA reveal that Plaintiff had earnings in the years 1974 through 1981, 1983 through 1991, 1996 through 1997, and 1999 through 2007.  (Tr. 175).  His annual earnings range from a low of no earnings in 1982, from 1992 through 1995, in 1998, and from 2008 through 2009, to a high of twenty-two thousand four hundred fifty-four dollars and sixty-five cents ($22,454.65) in 1989.  (Tr. 175).  His total earnings during those thirty-five (35) years were one hundred sixty-three thousand forty-two dollars and fifty-eight cents ($163,042.58).  (Tr. 175).  Plaintiff's alleged disability onset date is December 10, 2008.  (Tr. 31).   The impetus for his claimed disability is "mental illness."  (Tr. 187).

In a document entitled "Function Report - Adult" filed with the SSA, Plaintiff indicated that he lived alone in an apartment.  (Tr. 202).  He noted that he could take care of his personal care needs, such as showering and getting dressed,

---

7. "Person closely approaching advanced age.  If you are closely approaching advanced age (age 50-54), we will consider that your age along with a severe impairment(s) and limited work experience may seriously affect your ability to adjust to other work."  20 C.F.R. 404.1563(d).

without any problems, assistance, or reminders.  (Tr. 203-204).  He prepared his own meals, and was able to clean and do laundry.  (Tr. 203-204).  Plaintiff did not drive, but was able to go out alone, and left his house approximately once a day. (Tr. 205).  He could count change, handle a savings account, and use a checkbook. (Tr. 205).

Regarding his concentration and memory, Plaintiff needed special reminders to take his medicine.  (Tr. 204).  He could not pay attention for too long, did not finish what he started, did not follow written or spoken instructions well, did not handle stress well, and handled changes in routine "so so."  (Tr. 207-208).

Socially, Plaintiff left his apartment once a day, and read and watched television, but denied spending time with others.  (Tr. 205-206).  He reported that he had  problems getting along with family, friends, neighbors, or others.  (Tr. 207-208).  He had been fired previously because of problems getting along with other people.  (Tr. 208).  He reported that he "heard voices."  (Tr. 208).  In the function report, when asked to check items which his "illnesses, injuries, or conditions affect," Plaintiff did <u>not</u> check lifting, bending, or concentration.  (Tr. 207).

At his hearing, Plaintiff alleged that his mental health impairments have prevented him from being able to work since December of 2008.  (Tr. 61).  At the

time of his hearing, Plaintiff had been receiving treatment for his mental health issues about once a month, and was taking medications that caused sleepiness and short-term memory problems.  (Tr. 62, 64-65).  He stated that he felt his medications were not working well, and that he had problems with authority figures to the extent that he felt he could not work under supervision.  (Tr. 64-65).  He stated that he lived alone, and was able to cook, take care of his personal needs, maintain his apartment, and do his laundry.  (Tr. 66-67).  He had help from his family members doing these things.  (Tr. 66-67).  He spent his time volunteering at a church for approximately fifteen (15) hours a week on an unscheduled basis.  (Tr. 67).  He also volunteered for his local masonic lodge where he would cook for fundraisers for the lodge.  (Tr. 67-68).  He stated that volunteering in these positions involved minimal interaction with others and did not typically aggravate him.  (Tr. 69).  He stated that if he felt a conflict coming on while volunteering, he would "walk off" and sometimes would leave and other times would return to what he was doing.  (Tr. 69).  He indicated that he had issues with supervisors in the past, and that he had been involved in physical altercations.  (Tr. 70).  He had been fired twice, once after a verbal altercation with a supervisor at his last job, and once for "telling [someone] how to do something [because he] was in charge" and did not like being told what to do.  (Tr. 70-71).

6

At the time of the hearing, he had been experiencing auditory hallucinations for three (3) to four (4) years, and that he had currently been hearing voices at times. (Tr. 71). These voices were "good" and "bad," with the bad voices telling Plaintiff to do bad things. (Tr. 73). However, Plaintiff testified that he had never acted on these "bad" voices. (Tr. 73). He indicated that he had not been smoking marijuana anymore, but that the voices remained despite this fact. (Tr. 74). Plaintiff indicated several times that he had a fear of explaining his mental health symptoms to others because he did not want to be sent to First Hospital. (Tr. 76). He stated that he felt that he did not always have control over the "buzz words" that would lead to him being hospitalized in a mental hospital. (Tr. 77). Lastly, he indicated that he had difficulty concentrating while doing things like watching television or reading a book. (Tr. 80-81).

## MEDICAL RECORDS

Plaintiff's relevant medical records will be reviewed, including his records dating back to 2007, despite the alleged onset date being December 10, 2008, because the ALJ considered these records in his decision.

On December 17, 2007, Plaintiff was admitted to Glen Brooke Behavioral Health due to complaints of a depressed mood and suicidal thoughts. (Tr. 276). He had been experiencing decreased sleep, appetite, and energy, feelings of

hopelessness and worthlessness, and suicidal ideations with a plan to "jump out of

a window." (Tr. 276). He reported that he had four (4) to five (5) shots of liquor

daily, with his last use occurring one (1) week prior to his hospitalization. He also

admitted to using cocaine and cannabis, with his blood work coming back positive

for cocaine. (Tr. 276). He indicated that he had been arrested for disorderly

conduct in the past. (Tr. 277). His physical exam showed that evidence of

psychomotor retardation, decreased rate and volume of speech, an irritable affect,

a dysphoric mood, and a goal-directed thought process. (Tr. 277). He denied

having any delusional thoughts or auditory or visual hallucinations. (Tr. 277).

His insight was poor, his judgment was impaired, and his cognition was grossly

intact. (Tr. 277). His Axis I diagnoses included Depression, not otherwise

specified, and Polysubstance Dependence (cocaine, alcohol, and cannabis), and his

Global Functioning Assessment ("GAF")[8] score on admission was a twenty (20).

---

8. The GAF score, on a scale of 1-100, allows a clinician to indicate his judgment
of a person's overall psychological, social and occupational functioning, in order
to assess the person's mental health illness. American Psychiatric Association
(2000). Diagnostic and Statistical Manual of Mental Disorders (4th ed., text rev.).
Washington, DC: Author. A GAF score is set within a particular range if either
the symptom severity or the level of functioning falls within that range. Id. The
score is useful in planning treatment and predicting outcomes. Id. The GAF
rating is the single value that best reflects the individual's overall functioning at
the time of examination. The rating, however, has two components: (1) symptom
severity and (2) social and occupational functioning. The GAF is within a
particular range if either the symptom severity or the social and occupational level

During his stay, Plaintiff was prescribed thiamine, folate, Remeron, and

Trazodone.  (Tr. 277).  It was reported that, during the course of his

hospitalization, he seemed to be "entitled and was angry at the system for not

helping him.  He vented his anger and frustration during the [therapy] sessions.

He was angry [at a doctor] when he [he] suggested that [he] was helpless at fixing

---

of functioning falls within that range.  When the individual's symptom severity
and functioning level are discordant, the GAF rating reflects the worse of the two.
Thus, a suicidal patient who is gainfully employed would have a GAF rating
below 20.  A GAF score of 21-30 represents behavior considerably influenced by
delusions or hallucinations or serious impairment in communication or judgment
or inability to function in almost all areas.  Id.  A GAF score of 31-40 represents
some impairment in reality testing or communication or major impairment in
several areas, such as work or school, family relations, judgment, thinking or
mood.  Id.  A GAF score of 41-50 indicates serious symptoms or any serious
impairment in social, occupational or school functioning.  Id.  A GAF score of 51
to 60 represents moderate symptoms or any moderate difficulty in social,
occupational, or school functioning.  Id.  A GAF score of 61-70 indicates some
mild symptoms or some difficulty in social, occupational, or school functioning.
Id.

> Recently, the American Psychiatric Association no longer uses the GAF
> score for assessment of mental disorders due to concerns about subjectivity
> in application and a lack of clarity in the symptoms to be analyzed.  Solock
> v. Astrue, 2014 U.S. Dist. LEXIS 81809, *14-16 (M.D. Pa. June 17, 2014)
> (citing Ladd v. Astrue, 2014 U.S. Dist. LEXIS 67781 (E.D. Pa. May 16,
> 2014)); See Am. Psychiatric Assoc., Diagnostic and Statistic Manual of
> Mental Disorders 5d, 16 (2013).  As a result, the SSA permits ALJs to use
> the GAF score as opinion evidence when analyzing disability claims
> involving mental disorders; however, a "GAF score is never dispositive of
> impairment severity," and the ALJ, therefore, should not "give controlling
> weight to a GAF from a treating source unless it is well[-]supported and not
> inconsistent with other evidence."  SSA AM-13066 at 5 (July 13, 2013).

[Plaintiff's] social issues." (Tr. 278). His mood improved during his stay, and he was discharged on December 21, 2007. (Tr. 278). His Axis I diagnoses at discharge was Depression, Anxiety Disorder, and Polysubstance Dependence, and his GAF on discharge was sixty (60). (Tr. 278). His medications at discharge included Remeron, Ambien, and Naprosyn. (Tr. 278).

On January 3, 2008, Plaintiff had an appointment at Community Counseling Services of Northeastern Pennsylvania. (Tr. 306). He reported that he had been depressed, and wanted to jump out a window. (Tr. 307). His medications included Remeron, Ambien, and Naprosyn. (Tr. 307). He reported that he had currently been abusing alcohol and drugs, but denied that he had any drug or alcohol problems. (Tr. 307-308). He indicated that he had been experiencing a depressed mood, decreased energy, helplessness, worthlessness, tearfulness, irritability, agitation, and hopelessness daily. (Tr. 308). He was described as being disheveled, anxious, irritable, agitated, restless, and cooperative. (Tr. 320). His exam revealed that he had poor insight, poor judgment, normal speech, average intellect, a normal thought process and thought content, and an intact memory. (Tr. 320-321). He indicated that he had anger management issues and experienced homicidal, assaultive, and suicidal ideations when he was not complying with his medication. (Tr. 310-311). His legal history included arrests

for disorderly conduct and fighting.  (Tr. 315).  His diagnoses included Depressive

Disorder and Polysubstance Dependence, and his GAF was a fifty (50).  (Tr. 306,

321). His medications were switched to include Celexa and Seroquel.  (Tr. 324).

On January 24, 2008, Plaintiff had an appointment at Community

Counseling Services of Northeastern Pennsylvania.  (Tr. 327).  He indicated he

had been experiencing depression, auditory hallucinations, mania, anxiety, sleep

problems, and mood swings.  (Tr. 327).  He admitted to present alcohol and drug

abuse.  (Tr. 327).  He stated he had still been experiencing depression, but was

unable to afford his medications.  (Tr. 327).  His mental status exam revealed a

neat appearance, poor sleep, a normal thought process and content, normal speech,

a euthymic mood, a blunted affect, fair insight and judgment, and good impulse

control.  (Tr. 327).  He was instructed to discontinue Remeron and to start Zyprexa

and continue on Celexa.  (Tr. 327).

Plaintiff was hospitalized at First Hospital Wyoming Valley from March 4,

2008 to March 11, 2008 due to complaints of impaired concentration,

preoccupation, suicidal thoughts, weight gain, sleep disturbances, alcohol and

drug abuse problems, increased anger and irritability, and a melancholy attitude.

(Tr. 292).  He complained of hearing voices, telling him to stop taking drugs.  (Tr.

295).  He admitted to drinking a fifth and a half of whiskey a day, with a drinking

pattern of binging alone with friends, at home, and in taverns. (Tr. 295). Plaintiff also indicated that he abused up to an eight ball of cocaine a day, marijuana, and Vicodin. (Tr. 295). His mental status examination revealed agitated gestures, a slovenly appearance, perplexed facial expressions, speech that had a slow pace, low volume, and logical and coherent form, a short spanned attention, a sad mood, and a flat affect. (Tr. 296). He was oriented in all three (3) spheres to person, place, and time, had intact judgment, fair insight, and intact short and long term memory. (Tr. 297). His GAF on admission was a twenty-five (25). (Tr. 297). Plaintiff was prescribed Celexa and Seroquel, and responded to these medications during his hospitalization. (Tr. 293). Plaintiff was detoxified from cocaine without complications, and attended Alcoholics Anonymous meetings. (Tr. 293). His discharge Axis I diagnoses included Schizoaffective Disorder and Polysubstance Dependence (alcohol, cocain, marijuana, and Vicodin). (Tr. 292-293). His medications upon discharge included Celexa and Seroquel. (Tr. 292).

On April 14, 2008, Plaintiff had an appoint at Community Counseling of Northeastern Pennsylvania. (Tr. 326). His chief complaints at this visit included depression, hopelessness, helplessness, suicidal and homicidal ideations, auditory hallucinations, mania, sleep problems, anxiety, and appetite problems. (Tr. 326). He also reported that he was presently abusing alcohol and drugs. (Tr. 326). His

mental status exam revealed he had a neat appearance, poor sleep, a normal thought process and thought content, an irritable and agitated mood, blunted affect, and fair insight, judgment, and impulse control. (Tr. 326). His Celexa and Seroquel doses were increased. (Tr. 326).

Plaintiff was hospitalized at First Hospital Wyoming Valley from April 26, 2008 to May 2, 2008 due to complaints of impair concentration, preoccupation, impaired judgment, suicidal thoughts and statements, high anxiety, depression, sleep disturbance and alcohol and drug abuse problems. (Tr. 352). His GAF upon admission was a twenty (20). (Tr. 351). His urine screening was positive for cocaine and cannabinoid. (Tr. 351). His mental status examination upon arrival revealed he was alert and oriented, his mood was anxious and depressed, his speech was relevant and coherent, and his insight was superficial. (Tr. 355). He was prescribed Celexa and Seroquel, attended all group sessions, completed goals, and shared and gave good feedback. (Tr. 352). His discharge Axis I diagnoses included Schizoaffective Disorder and Polysubstance Disorder. (Tr. 351). His discharge GAF was a fifty-five (55). His discharge medications included Celexa and Seroquel. (Tr. 351).

On May 6, 2008, Plaintiff had an appointment at Community Counseling Services of Northeastern Pennsylvania. (Tr. 325). He reported that he had been

doing well, and denied any suicidal or homicidal ideations.  (Tr. 325).  His exam

indicated that he had a neat appearance, good sleep and appetite, normal thought

content and speech, a euthymic mood, a bright affect, present insight and

judgment, and good impulse control.  (Tr. 325).  He reported that he had been

compliant with taking Celexa and Seroquel.  (Tr. 325).

On May 25, 2008, Dr. Anthony Galdieri performed a Psychiatric Review

Technique.  (Tr. 330).  Dr. Galdieri categorized Plaintiff as having Schizophrenic

Disorder, and evaluated this disorder under Listing 12.03.  (Tr. 330).  He also

categorized Plaintiff as having Substance Addiction Disorders, and evaluated this

disorder under Listing 12.09.  (Tr. 330).  Ultimately, Dr. Galdieri opined that

Plaintiff's disorders did not precisely satisfy the diagnostic criteria for Listings

12.03 or 12.09.  (Tr. 332, 338).  He opined that, with regards to criteria "B" for

Listings 12.03 and 12.09, Plaintiff had mild restrictions in activities of daily living

and in difficulties in maintaining social functioning, moderate restrictions in

difficulties in maintaining concentration, persistence, or pace, and only one (1) or

two (2) repeated episodes of decompensation, each of extended duration.  (Tr.

340).  He further opined that Plaintiff did not meet the "C" criteria for Listings

12.03 or 12.09.  (Tr. 341).  In the consultation notes section, Dr. Galdieri

explained that there had been "steady improvement with [Plaintiff's]

Schizoaffective [Disorder]," and that he "did not note any unusual behaviors." (Tr. 342).

Dr. Galdieri also completed a Mental Residual Functional Capacity ("RFC") Assessment on May 28, 2008. (Tr. 343). He opined that Plaintiff was only moderately limited in three (3) areas, including: the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; and the ability to respond appropriately to changes in the work setting. (Tr. 343-344). With regards to all other categories, Dr. Galdieri opined that Plaintiff was not significantly limited. (Tr. 343-344). Ultimately, he opined that "[b]ased on the evidence of record, [Plaintiff's] statements are found to be partially credible," and that "[Plaintiff] is able to met the basic mental demands of competitive work on a sustained basis despite the limitations resulting from his impairment." (Tr. 345).

Plaintiff was hospitalized at First Hospital Wyoming Valley from October 29, 2008 to November 4, 2008 due to complaints of depression, poor sleep, hearing "mumbling voices," and having suicidal and homicidal thoughts. (Tr. 371, 373). His mental status exam revealed he was alert and oriented, he had a subdued mood, he was depressed, his affect was flat, his judgment was poor, and he was positive for marijuana. (Tr. 374-375, 413). His Axis I discharge diagnosis

was Schizoaffective Disorder, and his discharge medications included Trilafon, Celexa, and Trazodone.  (Tr. 371).

On December 10, 2008, Plaintiff had an appointment with Dr. Saxon at Behavioral Health Services for Schizoaffective Disorder and Polysubstance Abuse.  (Tr. 493).  He reported that he had been complying with his medicine, that he had a beer two (2) weeks earlier, that his appetite was good, and that he had been experiencing intermittent sleep patterns.  (Tr. 493).  He had not been experiencing suicidal or homicidal thoughts, hallucinations, delusions, or obsessions.  (Tr. 493).  He was oriented in all three (3) spheres, his hygiene was appropriate, his affect was bright, his mood was pleasant, his memory and intelligence were intact and average, and his insight and judgment were good.  (Tr. 493).  Plaintiff was instructed to keep taking his prescribed medications, and to return for a follow-up visit in four (4) weeks.  (Tr. 493).

On January 27, 2009, Plaintiff had an appointment with Karen Cooper, a registered nurse with Behavioral Health Services.  (Tr. 492).  He was oriented, his appearance was neat, his sleep was poor, he had been experiencing auditory hallucinations and paranoia, his thought process was within normal limits, his speech was normal, his mood was depressed, his affect was bright, his insight and judgment were present, and his impulse control was good.  (Tr. 492).  His

16

diagnoses included depression and anxiety.  (Tr. 492).

After missing his scheduled appointment on February 24, 2009, Plaintiff

had an appointment with Dr. Shah at Behavioral Health Services on February 26,

2009.  (Tr. 490-491).  He reported that his medicine was not curing him, but was

helping.  (Tr. 490).  He had difficulty sleeping, but had a good appetite.  (Tr. 490).

He reported that he had a past history of alcohol and drug use.  (Tr. 490).  He

denied experiencing racing thoughts and visual hallucinations, but was

experiencing auditory hallucinations in the form of a humming noise, but no voice

commands.  (Tr. 490).  He was oriented in all three (3) spheres, his hygiene was

good, his affect was full, he had a depressed and anxious mood, his memory and

intelligence were intact and average, and his insight and judgment were intact and

appropriate.  (Tr. 490).  His diagnoses included Schizoaffective Disorder and

Polysubstance Abuse.  (Tr. 490).  He was instructed to take his medications as

prescribed, to keep his scheduled appointments, and to call if he needed any help.

(Tr. 490).

On April 23, 2009, Plaintiff had an appointment with Dr. Shah at

Behavioral Health Services.  (Tr. 489).  Plaintiff reported that he had been

experiencing sporadic sleep, that he had been forgetting to take his medicine, and

that he occasionally drank alcohol or used a "high ball."  (Tr. 489).  He denied

17

experiencing visual hallucinations, racing thoughts, or depressive episodes, but reported that he had been experiencing auditory hallucinations, and occasionally saw a "shadowy figure." (Tr. 489). He was oriented in all three (3) spheres, his hygiene was good, his affect was full, his memory and intelligence were intact and average, and his insight and judgment were intact and appropriate. (Tr. 489). His diagnoses included Schizoaffective Disorder and Polysubstance Dependence. (Tr. 489). His medications list was illegible, he was instructed to take his medications as prescribed and to keep his scheduled appointments, and he was made aware of the twenty-four (24) hour crisis services. (Tr. 489).

On May 22, 2009, Plaintiff had an appointment with Dr. Shah at Behavioral Health Services. (Tr. 487). Plaintiff reported that he had stopped drinking daily and had been sober for six (6) days. (Tr. 487). He reported that he had been having good days and "angry" days during which he stayed away from people. (Tr. 487). His sleep varied from forty-five (45) minutes to "all day," and his appetite was "alright." (Tr. 487). He denied experiencing any suicidal or homicidal thoughts, visual hallucinations or racing thoughts, but admitted to having auditory hallucinations. (Tr. 487). He was oriented in all three (3) spheres, his hygiene was good, his affect was full, his mood varied from "good to angry," his memory and intelligence were intact and average, and his insight and judgment

18

were intact and appropriate.  (Tr. 487).  His medications list was illegible, he was

instructed to take his medications as prescribed and to keep his scheduled

appointments, and he was made aware of the twenty-four (24) hour crisis services.

(Tr. 487).

On June 19, 2009, Plaintiff had an appointment with Dr. Shah at Behavioral

Health Services.  (Tr. 486).  Plaintiff reported that his appetite had increased, but

that he still had difficulty sleeping.  (Tr. 486).  He denied having any visual

hallucinations, delusions, or racing thoughts, but admitted to experiencing

depressive episodes and auditory hallucinations.  (Tr. 486).  He was oriented in all

three (3) spheres, his hygiene was good, his affect was full, he was "moody," his

memory and intelligence were intact and average, and his insight and judgment

were intact and appropriate.  (Tr. 486).  His diagnosis was Schizoaffective

Disorder.  (Tr. 486).  His medications list was illegible, he was instructed to take

his medications as prescribed and to keep his scheduled appointments, and he was

made aware of the twenty-four (24) hour crisis services.  (Tr. 486).

On July 17, 2009, Plaintiff had an appointment with Dr. Shah at Behavioral

Health Services.  (Tr. 485).  Plaintiff had not been compliant with medications,

and reported difficulty sleeping.  (Tr. 485).  Plaintiff denied having any suicidal or

homicidal thoughts, hallucinations, racing thoughts, or delusions.  (Tr. 485).  He

19

was oriented in all three (3) spheres, his hygiene was good, his affect was full, he was "moody," his memory and intelligence were intact, and his insight and judgment were fair.  (Tr. 485).  His diagnoses included Schizoaffective Disorder and Polysubstance Dependence.  (Tr. 485).  His medications list was illegible, he was instructed to take his medications as prescribed and to keep his scheduled appointments, and he was made aware of the twenty-four (24) hour crisis services. (Tr. 485).

On July 21, 2009, Dr. Freemont testified as a medical expert in an oral hearing for Plaintiff's prior DIB and SSI applications, which were subsequently denied.  (Doc. 15, pp. 19-26).  During the oral hearing, Dr. Freemont first asked Plaintiff if the medicine he was taking stopped the voices he was hearing, to which Plaintiff replied that the medicine did not stop the voices.  (Id. at 19).  Dr. Freemont asked Plaintiff if he had ever been arrested for hurting anyone or had been in any fights, to which Plaintiff replied that he had never been arrested for hurting anyone, but that he had been in a couple fights, but not lately because he had been "locking [him]self away."  (Id. at 19-20).  He also questioned Plaintiff regarding his drug use, and Plaintiff replied that he had not been abusing drugs. (Id. at 20-21).  Dr. Freemont then testified that he believed Plaintiff had depression with psychotic episodes that was labeled in Plaintiff's medical history

as Schizoaffective Disorder.  (Id. at 21).  Dr. Freemont admitted that he did not

have Dr. Shah's notes to review, and did not know what medications Plaintiff had

been taking, but that there was "absolutely no indication that these auditory

hallucinations ha[d] been medicated."  (Id. at 21-22).  Dr. Freemont testified that,

in his opinion, Plaintiff met Listing 12.04, and had marked limitations for all four

categories under the "B" criteria.  (Id. at 23).

On August 11, 2009, Plaintiff had an appointment with Dr. Shah at

Behavioral Health Services.  (Tr. 483).  The notes from this visit are mainly

illegible, but what could be read was that Plaintiff was oriented in all three (3)

spheres, and had coherent speech, appropriate affect, an anxious mood, intact

memory and intelligence, and fair insight and judgment.  (Tr. 483).  Plaintiff

denied experiencing hallucinations and delusions.  (Tr. 483).

On September 11, 2009, Plaintiff had an appointment at Behavioral Health

Services for medication management.  (Tr. 482).  Plaintiff stated that he had been

feeling depressed.  (Tr. 482).  His appetite was normal, but he had difficulty

sleeping.  (Tr. 482).  He was oriented in all three (3) spheres, his hygiene was

good, his speech was normal, his affect was blunted, his mood was "so-so," his

memory and intelligence were intact, and his insight and judgment were fair.  (Tr.

482).  He reported that he had been experiencing auditory hallucinations, but not

visual ones. His medications list was illegible, and he was instructed to take his medications as prescribed and keep his scheduled appointments. (Tr. 482).

On November 6, 2009, Plaintiff had an appointment at Behavioral Health Services. (Tr. 481). Plaintiff stated he was doing "ok," denied suicidal and homicidal ideations, and was reserved and vague. (Tr. 481). Plaintiff indicated he was compliant with medications, and that he had a history of past alcohol and drug use. (Tr. 481). His sleep was fair and his appetite was good. (Tr. 481). He was oriented in all three (3) spheres, and had fair hygiene, a flat affect, and an "okay" mood. (Tr. 481). Plaintiff reported that he had been experiencing auditory hallucinations. (Tr. 481). His diagnosis was Schizoaffective Disorder. His medications included Celexa, Vistaril, and Trilafon. (Tr. 481). He was instructed to keep taking his medications, to keep his scheduled appointments, and to call with any concerns. (Tr. 481).

On November 17, 2009, Plaintiff had an appointment with Dr. Shah at Behavioral Health Services. The notes from this visit are entirely illegible. (Tr. 479-480).

On December 18, 2009, Plaintiff had an appointment at Behavioral Health Services. (Tr. 478). The notes from this visit regarding Plaintiff's symptoms are largely illegible. (Tr. 478). Plaintiff indicated that he had been compliant with his

medications, and that he had no history of past alcohol or drug use.  (Tr. 478).  He was oriented in all three (3) spheres, his hygiene was good, his speech was normal, his affect was full, his mood was "so-so," his memory and intelligence were intact, and his insight and judgment were fair.  (Tr. 478).  His diagnosis was Schizoaffective Disorder.  (Tr. 478).

On January 15, 2010, Plaintiff had an appointment at Behavioral Health Services.  (Tr. 477).  He indicated that he had been experiencing some depression and agoraphobia, and that he felt withdrawn from society.  (Tr. 477).  He was compliant with his medications, and admitted to a history of past alcohol and drug use.  (Tr. 477).  He denied having any suicidal or homicidal thoughts.  (Tr. 477). He was oriented to all three (3) spheres, and had good hygiene, normal speech, full affect, and an anxious mood.  (Tr. 477).  His memory and intelligence were intact and average, and his insight and judgment were fair.  (Tr. 477).  His exam was positive for anxiety, agoraphobia, and auditory and visual hallucinations, but was negative for obsessions.  (Tr. 477).  His diagnosis was Schizoaffective Disorder. (Tr. 477).  His medications included Trilafon, Celexa, and Vistaril, and he was instructed to keep taking his medications and to keep his scheduled appointments. (Tr. 477).

On February 17, 2010, Plaintiff had an appointment at Behavioral Health

Services.  (Tr. 475).  He reported that he had been having auditory hallucinations, and that he had not been sleeping well.  (Tr. 475).  He indicated that he had been compliant with his medication, and that he had a history of past drug and alcohol abuse.  (Tr. 475).  He denied suicidal and homicidal thoughts.  (Tr. 475).  He was oriented to all three (3) spheres, and had coherent speech, an appropriate affect, and an anxious and irritable mood.  (Tr. 475).  His memory and intelligence were intact, and his insight and judgment were fair.  (Tr. 475).  No diagnosis was listed. (Tr. 475).

On March 17, 2010, Plaintiff had an appointment with Behavioral Health Services.  (Tr. 474).  He reported that he had been restless and depressed.  (Tr. 474).  He indicated he had been complying with his medicine, and that he had not been experiencing suicidal or homicidal thoughts.  (Tr. 474).  Plaintiff was oriented to all three (3) spheres, and had good hygiene, normal speech, full affect, and a euthymic mood.  (Tr. 474).  Plaintiff reported that he had been experiencing auditory hallucinations and mood swings.  (Tr. 474).  His diagnosis was Schizoaffective Disorder.  (Tr. 474).  He was instructed to take his medications, to keep his scheduled appointments, and to call with any concerns.  (Tr. 474).

On April 14, 2010, Plaintiff had an appointment with Behavioral Health Services for hallucinations and hearing voices.  (Tr. 473).  He indicated he had

been complying with medications, which included Seroquel and Rispendal, but that he still had difficulty sleeping. (Tr. 473). He denied having any suicidal or homicidal thoughts. (Tr. 473). Plaintiff was oriented to all three (3) spheres, had good hygiene and speech, had a full affect, was "moody," and had been experiencing visual and auditory hallucinations. (Tr. 473). His memory, intelligence, judgment, and insight were intact. (Tr. 473). His diagnosis was Schizoaffective Disorder. (Tr. 473). The medication list from this visit is illegible. (Tr. 473). Plaintiff was instructed to take his medications as prescribed, to keep his scheduled appointments, and to call if he had any concerns. (Tr. 473).

On April 28, 2010, Plaintiff had an appointment at Behavioral Health Services for hallucinations and hearing voices, with no changes from his previous visit. (Tr. 472). He was complying with his medication without side effects, admitted to having two (2) to three (3) drinks a week, and had problems sleeping. (Tr. 472). He denied having suicidal or homicidal thoughts. (Tr. 472). He was oriented in all three (3) spheres, and had good hygiene, normal speech, appropriate affect, a miserable mood, intact memory, intelligence, insight, and judgment. (Tr. 472). He was positive for hallucinations and voices, but negative for delusions, obsessions, and racing thoughts. (Tr. 472). His diagnosis was Schizoaffective Disorder. (Tr. 472). He was instructed to continue taking his medications, and

25

had a follow-up appointment scheduled in four (4) weeks.  (Tr. 472).

On June 4, 2010, Plaintiff had an appointment at Behavioral Health Services.  (Tr. 471).  He reported that he had still been having difficulty getting to sleep, but that he had been complying with this medication, and that he did not have any other medical problems.  (Tr. 471).  He admitted to alcohol use, but denied any drug use and suicidal or homicidal thoughts.  (Tr. 471).  He was oriented to all three (3) spheres, was noted as having good hygiene, had a bland affect and pleasant mood, denied hallucinations, delusions, and obsessions, and had fair memory, intelligence, insight, and judgment.  (Tr. 471).  His diagnoses included Depressive Disorder, not otherwise specified, and Polysubstance Dependence.  (Tr. 471).  The medication list from this visit is illegible.  (Tr. 471).

On July 9, 2010, Mark Hite, Ed.D. performed a Psychiatric Review Technique.  (Tr. 659).  Dr. Hite based his medical disposition on the following categories: Schizophrenic Disorder under Listing 12.03, an affective disorder under Listing 12.04, and a substance abuse disorder under Listing 12.09.  (Tr. 659).  Regarding Listings 12.03, 12.04 and 12.09, Dr. Hite opined that Plaintiff had Schizoaffective Disorder, Depressive Disorder, and Polysubstance Dependence Disorder based on his history, but that Plaintiff did not meet listing requirements for Listings 12.03, 12.04, or 12.09.  (Tr. 661-662, 667).  Regarding

the "B" criteria for all Listings 12.03, 12.04, and 12.09, Dr. Hite opined that

Plaintiff had no restrictions in activities of daily living, had moderate difficulties

maintaining social functioning, had moderate difficulties in maintaining

concentration, persistence and pace, and had no repeated episodes of

decompensation, each of extended duration. (Tr. 669). Regarding the "C" criteria

for these same Listings, Dr. Hite opined that evidence did not establish the

presence of this criteria. (Tr. 670).

Also on July 9, 2010, Dr. Hite completed a Mental Residual Functional

Capacity ("RFC") Assessment form. (Tr. 672). Dr. Hite opined that Plaintiff was

not significantly limited in the following areas: the ability to remember locations

and work-like procedures; the ability to understand and remember very short and

simple instructions; the ability to carry out very short and simple instructions; the

ability to maintain attention and concentration for extended periods of time; the

ability to perform activities within a schedule, maintain regular attendance, and be

punctual within customary tolerances; the ability to sustain an ordinary routine

without special supervision; the ability to make simple work-related decisions; the

ability to complete a normal workday and workweek without interruptions from

psychologically based symptoms and to perform at a consistent pace without an

unreasonable number and length of rest periods; the ability to interact

appropriately with the general public; the ability to ask simple questions or request assistance; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; the ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; the ability to be aware of normal hazards and take appropriate precautions; the ability to travel in unfamiliar places or use public transportation; and the ability to set realistic goals or make plans independently of others. (Tr. 672-673). Dr. Hite opined that Plaintiff was moderately limited in the following areas: the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to work in coordination with or proximity to others without being distracted by them; the ability to accept instructions and respond appropriately to criticism from supervisors; and the ability to respond appropriately to changes in the work setting. (Tr. 672-673). It is not clear what medical records Dr. Hite reviewed in arriving at these conclusions regarding Plaintiff's Mental RFC because Dr. Hite does not cite what records on which he based his opinion.

On July 30, 2010, Plaintiff had an appointment at Behavioral Health Services. (Tr. 784). He reported that he had no complaints and was doing well with no mood dysfunction or psychotic symptoms. (Tr. 784). He was compliant with his medications, and reported a past history of alcohol and drug use. (Tr.

28

784).  His appetite was good, but his sleep was interrupted.  (Tr. 784).  He had not been experiencing any homicidal or suicidal thoughts.  (Tr. 784).  He was oriented in all three (3) spheres, his hygiene was clean, his speech was normal, his affect was appropriate, his mood was slightly hypomanic, his memory and intelligence were intact, and his insight and judgment were fair.  (Tr. 784).  His diagnosis was Schizoaffective Disorder.  (Tr. 784).  He was instructed to continue on his medications, and to abstain from all drugs and alcohol.  (Tr. 784).

On October 4, 2010, Plaintiff had an appointment with Dr. Shah at Behavioral Health Services.  (Tr. 781).  Plaintiff reported that he had been experiencing poor sleep and severe depression.  (Tr. 781).  He was compliant with his medication, and reported a present history of alcohol and drug use.  (Tr. 781). He denied experiencing homicidal or suicidal thoughts, but admitted to auditory hallucinations and mild paranoia.  (Tr. 781).  He was oriented in all three (3) spheres, his hygiene was clean, his affect was flat, his mood was neutral, his memory and intelligence were intact, and his insight and judgment were superficial.  (Tr. 781).  His diagnosis was Schizoaffective Disorder.  (Tr. 781).  Dr. Shah strongly encouraged that Plaintiff get sober, and that he continue taking his medications.  (Tr. 781).

On October 15, 2010, Plaintiff underwent a chemistry panel ordered by Dr.

Evans.  (Tr. 704-706).  There were no detectable levels of the following

substances: amphetamine, barbituate, benzodiazepine, cocaine, ethanol,

methadone, methaqualone, opiates, phencyclidine, or propoxyphene.  (Tr. 704-

705).  However, Plaintiff tested positive for cannabinoids.  (Tr. 706).

On November 1, 2010, Plaintiff had an appointment with Dr. Shah at

Behavioral Health Services.  (Tr. 780).  Plaintiff reported that he had been doing

well, that his mood was stable, that his sleep was better, and that he had still been

hearing mumbling voices.  (Tr. 780).  He reported that he had been compliant with

his medications, and that he had not been experiencing any homicidal or suicidal

thoughts.  (Tr. 780).  He was oriented to all three (3) spheres, his hygiene was

clean, his affect was flat, his mood was neutral, his memory and intelligence were

intact, and his insight and judgment were superficial.  (Tr. 780).  His diagnoses

included Schizoaffective Disorder and Polysubstance Dependence.  (Tr. 780).  He

was instructed to continue taking his medications, and to call with any problems.

(Tr. 780).

On December 27, 2010, Plaintiff had an appointment with Dr. Shah at

Behavioral Health Services.  (Tr. 779).   The comments in the "chief complaints"

section are entirely illegible.  (Tr. 779).  Plaintiff had been compliant with

medication, and reported a past history of alcohol and drug use.  (Tr. 779).  He

reported that his sleep was interrupted, but his appetite was good.  (Tr. 779).  He

had not been experiencing any suicidal or homicidal thoughts.  (Tr. 779).  He was

oriented in all three (3) spheres, his hygiene was clean, his affect was flat , his

mood was euthymic, his memory and intelligence were intact, and his insight and

judgment were superficial.  (Tr. 779).  His diagnosis was Scizoaffective Disorder.

(Tr. 779).  He was encouraged to achieve total sobriety, and to take his

medications as prescribed.  (Tr. 779).

On February 21, 2011, Plaintiff had an appointment at Behavioral Health

Services.  (Tr. 778).  He reported that he had "no complaints" and was

experiencing no depressive symptoms, although he reported that he had not been

sleeping well.  (Tr. 778).  He had been compliant with his medications, and

admitted to a past history of alcohol and drug use.  (Tr. 778).  Plaintiff was

oriented in all three (3) spheres, his hygiene was clean, his affect was full, his

mood was argumentative, and his memory, intelligence, insight, and judgment

were intact.  (Tr. 778).  He was positive for auditory hallucinations of voices,

which he "easily dismisse[d]."  (Tr. 778).  His diagnosis was Schizoaffective

Disorder.  (Tr. 778).

On March 21, 2011, Plaintiff had an appointment at Behavioral Health

Services.  (Tr. 777).  Plaintiff was "refusing to talk" and was "waiting to see

Steve" because he "'[didn't] trust people.'" (Tr. 777).  He reported that he had been doing "okay" with his medications, and that he had a past history of alcohol and drug use.  (Tr. 777).  His sleep had been poor, and his appetite had been fair. (Tr. 777).  He was oriented to all three (3) spheres, his hygiene was neat, his speech was appropriate, his motor activity was normal, his affect was full, his mood was stable, his memory and intelligence were intact and average, and his insight and judgment were poor.  (Tr. 777).  He admitted to hearing voices, but refused to elaborate as to what these voices entailed.  (Tr. 777).  He denied visual hallucinations, paranoia, and delusions.  (Tr. 777).  His diagnosis was Schizoaffective Disorder.  (Tr. 777).  His medications list from this appointment is entirely illegible, and he was instructed to be compliant with his treatment plan and call with any concerns.  (Tr. 777).

On April 19, 2011, Plaintiff had an appointment at Behavioral Health Services.  (Tr. 776).  He reported he had been experiencing poor sleep habits, depression, and anxiety.  (Tr. 776).  He was compliant with his medications, but admitted to having one (1) to two (2) drinks per week.  (Tr. 776).  He was oriented to all three (3) spheres, his behavior was clear and cooperative, his affect was flat, his memory and intelligence were intact, and his insight and judgment were limited.  (Tr. 776).  His diagnosis was Schizoaffective Disorder.  (Tr. 776).

32

On June 22, 2011, Dr. Shah opined that Plaintiff was permanently and totally disabled due to his mental health conditions.  (Tr. 785).

On July 22, 2011, Plaintiff had an appointment with Dr. Shah at Behavioral Health Services.  (Tr. 775).  The notes from this appointment are entirely illegible. (Tr. 775).

## STANDARD OF REVIEW

When considering a social security appeal, the court has plenary review of all legal issues decided by the Commissioner.  See Poulos v. Commissioner of Social Security, 474 F.3d 88, 91 (3d Cir. 2007); Schaudeck v. Commissioner of Social Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999); Krysztoforski v. Chater, 55 F.3d 857, 858 (3d Cir. 1995).  However, the court's review of the Commissioner's findings of fact pursuant to 42 U.S.C. § 405(g) is to determine whether those findings are supported by "substantial evidence."  Id.; Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988). Factual findings which are supported by substantial evidence must be upheld.  42 U.S.C. §405(g); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently."); Cotter v. Harris, 642 F.2d 700, 704 (3d Cir. 1981) ("Findings of fact by the

Secretary must be accepted as conclusive by a reviewing court if supported by substantial evidence."); Mastro v. Apfel, 270 F.3d 171, 176 (4th Cir. 2001); Keefe v. Shalala, 71 F.3d 1060, 1062 (2d Cir. 1995); Martin v. Sullivan, 894 F.2d 1520, 1529 & 1529 n.11 (11th Cir. 1990).

Substantial evidence "does not mean a large or considerable amount of evidence, but 'rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); Johnson v. Commissioner of Social Security, 529 F.3d 198, 200 (3d Cir. 2008); Hartranft v. Apfel, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence has been described as more than a mere scintilla of evidence but less than a preponderance.  Brown, 845 F.2d at 1213.  In an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Federal Maritime Commission, 383 U.S. 607, 620 (1966).

Substantial evidence exists only "in relationship to all the other evidence in the record," Cotter, 642 F.2d at 706, and "must take into account whatever in the

record fairly detracts from its weight." Universal Camera Corp. v. N.L.R.B., 340

U.S. 474, 488 (1971).  A single piece of evidence is not substantial evidence if the

Commissioner ignores countervailing evidence or fails to resolve a conflict

created by the evidence.  Mason, 994 F.2d at 1064.  The Commissioner must

indicate which evidence was accepted, which evidence was rejected, and the

reasons for rejecting certain evidence.  Johnson, 529 F.3d at 203; Cotter, 642 F.2d

at 706-07.  Therefore, a court reviewing the decision of the Commissioner must

scrutinize the record as a whole.  Smith v. Califano, 637 F.2d 968, 970 (3d Cir.

1981); Dobrowolsky v. Califano, 606 F.2d 403, 407 (3d Cir. 1979).

## SEQUENTIAL EVALUATION PROCESS

To receive disability benefits, including supplemental security income, the

plaintiff must demonstrate an "inability to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment

which can be expected to result in death or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. §

432(d)(1)(A).  Further,

> [a]n individual shall be determined to be under a disability only
> if his physical or mental impairment or impairments are of such
> severity that he is not only unable to do his previous work but
> cannot, considering his age, education, and work experience,
> engage in any other kind of substantial gainful work which

exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.  For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 423(d)(2)(A).

The Commissioner uses a five-step process in evaluating disability and claims for disability insurance benefits.  See 20 C.F.R. § 404.1520; Poulos, 474 F.3d at 91-92.  This process requires the Commissioner to consider, in sequence, whether a claimant (1) is engaging in substantial gainful activity, (2) has an impairment that is severe or a combination of impairments that is severe, (3) has an impairment or combination of impairments that meets or equals the requirements of a listed impairment, (4) has the residual functional capacity to return to his or her past work and (5) if not, whether he or she can perform other work in the national economy.  Id.  As part of step four, the Commissioner must determine the claimant's residual functional capacity.  Id.  If the claimant has the residual functional capacity to do his or her past relevant work, the claimant is not disabled.  Id.  "The claimant bears the ultimate burden of establishing steps one through four."  Poulos, 474 F.3d at 92, citing Ramirez v. Barnhart, 372 F.3d 546,

36

550 (3d Cir. 2004).  "At step five, the burden of proof shifts to the Social Security

Administration to show that the claimant is capable of performing other jobs

existing in significant numbers in the national economy, considering the

claimant's age, education, work experience, and residual functional capacity. "  Id.

Residual functional capacity is the individual's maximum remaining ability

to do sustained work activities in an ordinary work setting on a regular and

continuing basis.  See Social Security Ruling 96-8p, 61 Fed. Reg. 34475 (July 2,

1996).  A regular and continuing basis contemplates full-time employment and is

defined as eight hours a day, five days per week or other similar schedule.  The

residual functional capacity assessment must include a discussion of the

individual's abilities.  Id.; 20 C.F.R. §§ 404.1545 and 416.945; Hartranft, 181 F.3d

at 359 n.1 ("'Residual functional capacity' is defined as that which an individual is

still able to do despite the limitations caused by his or her impairment(s).").

## ALJ DECISION

At step one, the ALJ found that Plaintiff had not engaged in substantial

gainful work activity from his alleged onset date of December 10, 2008.  (Tr. 33).

At step two, the ALJ determined that Plaintiff suffered from the severe[9]

_____

9. An impairment is "severe" if it significantly limits an individual's ability to
perform basic work activities.  20 C.F.R. § 404.921.  Basic work activities are the
abilities and aptitudes necessary to do most jobs, such as walking, standing,

combination of impairments of the following: "schizoaffective disorder, coronary

artery disease, obesity, left rotator cuff injury and history of substance abuse (20

C.F.R. 404.1520(c) and 416.920(c))."  (Tr. 33).

At step three of the sequential evaluation process, the ALJ found that

Plaintiff did not have an impairment or combination of impairments that met or

medically equaled the listed impairments in 20 C.F.R. Part 404, Subpart P,

Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925

and 416.926).  (Tr. 33).

At step four, the ALJ determined that Plaintiff had the RFC  to perform light

work.  (Tr. 36).  Specifically, the ALJ stated the following:

> The [Plaintiff] is limited to no overhead work and no crawling,
> kneeling, climbing of ladders or scaffolds. [Plaintiff] is limited
> to low stress work defined as simple, repetitive tasks involving
> simple judgment; no contact with the public; only occasional
> contacts with coworkers and supervisors; involving only
> occasional changes in work setting and no fast-paced
> production environment with no exposure to unprotected
> heights or dangerous machinery.

(Tr. 36).

─────────────────────

sitting, lifting, pushing, seeing, hearing, speaking, and remembering.  Id.  An
impairment or combination of impairments is "not severe" when medical and other
evidence establish only a slight abnormality or a combination of slight
abnormalities that would have no more than a minimal effect on an individual's
ability to work.  20 C.F.R. § 416.921; Social Security Rulings 85-28, 96-3p and
96-4p.

At step five of the sequential evaluation process, because Plaintiff could not perform any past relevant work, and considering the his age, education, work experience, and RFC, the ALJ determined "there are jobs that exist in significant numbers in the national economy that the [Plaintiff] can perform (20 C.F.R. 404.1569, 404.1569(a), 416.969, and 416.969(a))." (Tr. 40-41).

Thus, the ALJ concluded that Plaintiff was not under a disability as defined in the Social Security Act at any time between December 10, 2008, the alleged onset date, and the date of the ALJ's decision. (Tr. 42).

## DISCUSSION

On appeal, Plaintiff asserts the following arguments: (1) "the ALJ impliedly reopened Plaintiff's 2008 application, but ignored the testimony of Defendant's own Medical Expert that Plaintiff's mental impairment met the requirements of the Listing of Impairments;" (2) "the ALJ rejected the treating psychiatrist's opinion and overestimated Plaintiff's mental [RFC] because he committed mistakes of fact and thus misinterpreted the medical records;" and (3) "the ALJ failed to incorporate all of Plaintiff's credibly established mental functional limitations into his hypothetical question for the Vocational Expert, whose testimony consequently failed to consider all of those limitations and thus did not constitute substantial evidence supporting the ALJ's decision." (Doc. 16, pp. 3-4). Defendant disputes

these contentions.  (Doc. 19, pp. 13-26).

### 1.    <u>Testimony of Medical Expert Dr. Freemont</u>

Plaintiff asserts that the ALJ impliedly reopened Plaintiff's 2008

application, but erroneously ignored the testimony of medical expert Dr. Freemont

that Plaintiff met Listing 12.04, which was testimony from the oral hearing held in

2009 during Plaintiff's previous application for DIB and SSI, which was

subsequently denied.  It is understandable why Defendant would argue that the

ALJ impliedly reopened the 2008 DIB and SSI application that had already been

denied because, in his opinion, the ALJ referred to medical records from before

Plaintiff's alleged onset date of December 10, 2008, including Dr. Galdieri's

Mental RFC evaluation and his Psychiatric Review Technique.  (Tr. 35-36, 39-

40).  However, in reading the 2011 oral hearing transcript and the discussion that

took place between the ALJ and Plaintiff's attorney, it is determined that the ALJ

did not impliedly reopen Plaintiff's 2008 application, because, as discussed at the

oral hearing, the ALJ stated that he had "no problem" with having the "recording

of the prior hearing [of Medical Expert Dr. Freemont] added to the record;"

however, at no point did the ALJ state or imply that he was reopening Plaintiff's

2008 application.  (Tr. 51-52).  Furthermore, Plaintiff's attorney stated that he was

"not requesting reopening of that [2008 DIB and SSI] application, [] but [he was]

40

requesting that [the ALJ] consider the evidence from that period, and Dr.

Freemont's testimony now, in light of the fact that [he did] have contemporaneous

and up to date treatment records on an outpatient basis." (Tr. 54). Therefore,

while the ALJ considered evidence that occurred before the alleged onset date,

including medical records and Dr. Freemont's testimony from the earlier 2009

hearing, the ALJ did not reopen the earlier 2008 application, but rather generously

made the evidence part of the record and considered it when forming his opinion.

With regards to Plaintiff's claim that the ALJ erred in not discussing Dr.

Freemont's stance that Plaintiff met Listing 12.04, at the oral hearing, the ALJ

made it clear that he questioned the relevance of Dr. Freemont's testimony and

believed this testimony was flawed for several reasons, including: (1) Dr.

Freemont admitted that his opinion that Plaintiff met Listing 12.04 was based on

observation during the 2009 oral hearing; (2) Dr. Freemont admittedly did not

have all of Plaintiff's records to review or on which to base his medical opinion

that Plaintiff met Listing 12.04; and (3) Dr. Freemont did not directly examine

Plaintiff. (Tr. 52-53). However, while the ALJ discussed his position during the

oral hearing regarding Dr. Freemont's medical opinion that Plaintiff met Listing

12.04 and had marked restrictions in all four (4) criteria "B" categories, he failed

to discuss Dr. Freemont's opinion in his decision.

The preference for the treating physician's opinion has been recognized by the Third Circuit Court of Appeals and by all of the federal circuits.  See, e.g., Morales v. Apfel, 225 F.3d 310, 316-18 (3d Cir. 2000).  This is especially true when the treating physician's opinion "reflects expert judgment based on a continuing observation of the patient's condition over a prolonged time." Morales, 225 F.3d at 317; Plummer, 186 F.3d at 429; see also 20 CFR § 416.927(d)(2)(i)(1999) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.").

However, when the treating physician's opinion conflicts with a non-treating, non-examining physician's opinion, the ALJ may choose whom to credit in his or her analysis, but "cannot reject evidence for no reason or for the wrong reason."  Morales, 225 F.3d 316-18.  It is within the ALJ's authority to determine which medical opinions he rejects and accepts, and the weight to be given to each opinion.  20 C.F.R. § 416.927.  The ALJ is permitted to give great weight to a medical expert's opinion if the assessment is well-supported by the medical evidence of record.  See Sassone v. Comm'r of Soc. Sec., 165 F. App'x 954, 961 (3d Cir. 2006) (holding that there was substantial evidence to support the ALJ's RFC determination that the plaintiff could perform light work, even though this

determination was based largely on the opinion of one medical expert, because the medical expert's opinion was supported by the medical evidence of record); <u>Baker v. Astrue</u>, 2008 U.S. Dist. LEXIS 62258 (E.D. Pa. Aug. 13, 2008).

Regardless, the ALJ has the duty to adequately explain the evidence that he rejects or to which he affords lesser weight. <u>Diaz v. Comm'r of Soc. Sec.</u>, 577 F.3d 500, 505-06 (3d Cir. 2009) (holding that because the ALJ did not provide an adequate explanation for the weight he gave to several medical opinions, remand was warranted). "The ALJ's explanation must be sufficient enough to permit the court to conduct a meaningful review." <u>In re Moore v. Comm'r of Soc. Sec.</u>, 2012 U.S. Dist. LEXIS 100625, *5-8 (D.N.J. July 19, 2012) (citing <u>Burnett v. Comm'r of Soc. Sec.</u>, 220 F.3d 112, 119-20 (3d Cir. 2000)).

Initially, it is determined that the ALJ was under no duty to give the opinion of Dr. Freemont controlling weight because he was not considered to be treating physicians based on the factors listed in 20 C.F.R. § 416.927(d)(1)-(d)(6)[10] and the treating physicians' rule. However, in accordance with the aforementioned case

---

10. The factors to be applied to determine the appropriate weight to be given to the treating physician's opinion are: (1) length of treatment relationship and frequency of examination, (2) nature and extent of the treatment relationship, (3) supportability of the opinion by relevant evidence or explanation, (4) consistency of the opinion with the record as a whole, (5) whether the treating physician is a specialist, and (6) other factors which tend to support or contradict the opinion. <u>See</u> 20 C.F.R. § 416.927(d)(1)-(d)(6).

law, the ALJ did have the duty to adequately explain, in his decision and not just during the oral hearing, why he rejected or discounted Dr. Freemont's opinion that Plaintiff met Listing 12.04 because it was a medical opinion that was part of the record.  Because the ALJ did not discuss or adequately discount or reject Dr. Freemont's opinion in his decision, and in consideration of applicable statutes and precedent, it is determined that the ALJ's analysis at step three of the sequential evaluation process was flawed.   Accordingly, it is determined that substantial evidence does not support the ALJ's decision that Plaintiff did not meet Listing 12.04 or any of the other Listings involved, and, therefore, the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded.  Because remand is warranted at step three of the sequential evaluation process, the other issues remaining in this appeal will not be addressed.

## <u>CONCLUSION</u>

Based upon a thorough review of the evidence of record, this Court finds that the Commissioner's decision is not supported by substantial evidence. Therefore, pursuant to 42 U.S.C. § 405(g), the appeal will be granted, the decision of the Commissioner will be vacated, and the matter will be remanded to the Commissioner of the Social Security Administration.

A separate Order will be issued.

**Date**: February 18, 2015

**/s/ William J. Nealon**
**United States District Judge**
